UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
Urbana Division

TIMI W.,

        **Plaintiff,**

v.

**NANCY A. BERRYHILL,**
**Deputy Commissioner for Operations**
**performing the duties and functions**
**not reserved to the Commissioner of**
**Social Security,**

        **Defendant.**

Case No. 17-1366

## REPORT AND RECOMMENDATION

Plaintiff Timi W. seeks review under 405(g) of the Social Security Administration's denial of his application for disability insurance benefits. The parties filed cross motions for summary judgment. For the reasons explained below, the Court recommends that Plaintiff's Motion for Summary Judgment **(#11)** be **GRANTED**, Defendant's Motion for Summary Judgment **(#15)** be **DENIED**, and that this case be remanded under Sentence Four of § 405(g)

**I.    Background**

On December 13, 2013, Plaintiff filed an application for disability and disability insurance benefits, alleging disability beginning January 17, 2012. Plaintiff's claim was denied initially on April 1, 2014, and on reconsideration on January 14, 2015. Plaintiff, with his attorney, appeared and testified at a hearing before an Administrative Law Judge ("ALJ") on June 28, 2016. During the hearing, the ALJ heard testimony from an impartial vocational expert ("VE"), as well as an impartial medical expert ("ME"). The ALJ issued a decision on June 2, 2016, finding Plaintiff not disabled. (R. 17-27).

The ALJ found that Plaintiff has severe impairments of obesity, status post aneurysm with stent placement, migraine headaches, and obstructive sleep apnea. (R.

19.) The ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). Additionally, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except:

> [h]e can occasionally climb ramps and stairs but never ladders, ropes, or scaffolds. He can occasionally balance, stoop, kneel, crouch, or crawl. He can tolerate exposure to and/or work around vibration or hazards such as moving machinery or unprotected heights. He can perform simple routine tasks requiring no more than short simple instructions and simple work related decision-making with few work place changes.

(R. 21.) The ALJ found that Plaintiff was unable to perform any of his past relevant work, but found that jobs exist in significant numbers in the national economy that Plaintiff can perform considering Plaintiff's age, education, work experience, and residual functional capacity (R. 26.) The Appeals Council denied Plaintiff's Request for Review, making the ALJ's ruling the Commissioner's final decision.

## II.    Standard of Review

The court reviews a decision denying benefits to determine only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's decision. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walker v. Berryhill*, 900 F.3d 479, 482 (7th Cir. 2018) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). When reviewing the administrative record, the Court does not "reweigh the evidence or substitute [its] judgment for that of the ALJ." *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018).

Stated differently, if reasonable minds could differ as to whether Plaintiff is disabled, the Court must uphold the ALJ's decision to deny benefits. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). Importantly, "the ALJ must 'build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of

every piece of testimony and evidence.'" *Id.* (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

**III.  Analysis**

Plaintiff argues the ALJ's decision is erroneous for four reasons. First, Plaintiff argues that the ALJ failed to account for any of Plaintiff's non-exertional limitations, including his limitations in concentration, persistence, and pace. Second, Plaintiff argues that the ALJ erred by finding that Plaintiff's allegations are not entirely consistent with the evidence of record. Third, Plaintiff contends that the ALJ improperly violated the treating physician rule. Finally, Plaintiff argues that the ALJ's assessment that Plaintiff can perform other work is based on flawed VE testimony.

    **a.  Plaintiff's non-exertional limitations and the ALJ's subjective symptom analysis**

Plaintiff's first two arguments are intertwined and the Court will therefore address them together. Plaintiff's focus of his first argument is that the ALJ improperly ignored evidence of Plaintiff's alleged mental impairments. In making this argument, Plaintiff focuses almost entirely on the ALJ's assessment of the "paragraph B" criteria and what level of limitations Plaintiff has due to his allegedly debilitating headache symptoms. Indeed, Plaintiff's brief argues that while any error at Step 2 "may, in and of itself, be harmless, the real harm occurred later in the analysis." Plaintiff's Memorandum in Support of Motion for Summary Judgment, d/e #12, pg. 10. Plaintiff goes on to note that this "real harm" is that limiting Plaintiff to simple and routine tasks does not account for Plaintiff's need to "lie down most of the day in a dark and quiet room, at least three days a week." *Id.* This argument is in reference to Plaintiff's allegedly debilitating migraines. Similarly, Plaintiff's entire argument about the ALJ's subjective symptom analysis is focused on Plaintiff's subjective complaints surrounding his headaches. *Id.* at pgs. 11-13. Thus, the arguments are one in the same.

As Plaintiff correctly notes, at Step 2 of the ALJ's analysis, the ALJ considers the severity of Plaintiff's impairments. 20 C.F.R. §404.1520(a)(4)(iii). In doing so, the ALJ is required to incorporate findings and conclusions upon which an assessment of the

3

"paragraph B" criteria were reached. *See* 20 C.F.R. §404.1520. The paragraph B criteria require the ALJ to examine Plaintiff's abilities for marked restriction in two of four functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.[1]

Regarding Plaintiff's subjective complaints, under SSR 16-3p, the ALJ "consider[s] all of an individual's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the record." SSR 16-3p. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms." *Id.*

An ALJ may not discount a claimant's testimony solely because it is not substantiated by objective medical evidence. 20 C.F.R. § 404.1529(c)(2); SSR 16-3p; *Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015). However, an ALJ may consider the lack of objective evidence in conjunction with other factors, such as the claimant's activity levels and the treatment she received to alleviate the pain or other symptoms. 20 C.F.R. § 404.1529(c)(2)-(4); *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009).

### 1. Headaches Under the Paragraph B Criteria

Here, the ALJ found that Plaintiff has only mild limitations in activities of daily living ("ADLs"). The ALJ noted that Plaintiff does "a wide range of chores/daily activities **albeit on good days** related to his physical impairments. He attends to hygiene." (R. 20) (emphasis added). This was the extent of the ALJ's analysis of Plaintiff's limitations in activities of daily living under the paragraph B criteria.

The ALJ made it clear that Plaintiff's ability to perform ADLs was a focal point of why the ALJ believed Plaintiff's subjective headache complaints were not as severe as alleged. (R. 24). The ALJ notes that Plaintiff is involved "in a range of activities," including caring for two dogs, watching television, doing laundry and dishes, doing household repairs, cooking, and using a computer. *Id.* However, as the ALJ expressly

---

[1] While the paragraph B criteria have since been modified, the new criteria are not applicable to this case.

4

acknowledged in her analysis of the paragraph B criteria, this is what a **good** day looks like for Plaintiff. (R. 20).

On a bad day, Plaintiff testified that he can do nothing else but lie in a dark room, trying to keep it as quiet as possible, while he waits for the pain to stop. (R. 40; R. 244; R. 272). At the hearing, Plaintiff stated that he only has 6, 7, or 8 good days a month. *Id.* Moreover, the record contains several medical notes showing that Plaintiff has debilitating headaches 10-12 times a month. *See* (R. 60; R. 226; R. 298; R. 421-422; R. 470; R. 543; R. 616). There are also several instances showing that these headaches require multiple days of rest, often times 2-3 days a week, where Plaintiff is unable to eat. (R. 255; R. 271; R. 273; R. 416; R. 543). Plaintiff testified at the hearing that in the two-week period prior to the hearing, about 50% of the days were good, and 50% of the days were bad. (R. 40). It is unclear how the ALJ concluded that Plaintiff's ability to perform ADL's on his "good days" equated to only mild limitations in ADL's when half of Plaintiff's days were reported as "bad days."

The ALJ also noted that Plaintiff is "involved in his kids sports and with heading an organization of local musicians doing fundraising at local schools." (R. 24). Plaintiff actually reported, however, that while he tries to attend his children's sporting events, he has missed games because of his migraines. (R. 47). Additionally, Plaintiff did not report that he is "involved in his kids sports." Rather, Plaintiff testifies that he goes to these sporting events when he is able to, and sometimes he attends with a headache which results in him sitting in the stands and holding his head. (R. 48).

The ALJ also mischaracterized Plaintiff's testimony regarding the fundraising activities. Plaintiff actually testified that in 2014 his role was to go to schools in the county and attempt to fundraise, **on his good days**. (R. 42). Plaintiff further testified that there was no set schedule and he basically showed up to these schools unannounced. (R. 47). Again, it is difficult to see how unannounced visits to schools on "good days" and sitting in the stands at sporting events (sometimes with his head in his hands) supports a finding of "mild" impairment in activities of daily living, especially when Plaintiff also reported that he was unable to perform his daily tasks "3-4 times per week." (R. 665).

The ALJ noted that Plaintiff cooks "2-3 nights weekly," as well as mows the lawn, drives, washes dishes, and does laundry. (R. 24). Again, this is consistent with what Plaintiff can do on a "good day" and does not take into account the fact that Plaintiff has 10-12 "bad days" per month. The ALJ stated that Plaintiff reports that he uses a cell phone to interact with his girlfriend and go on Facebook. (R. 24). Once again, Plaintiff expressly noted that he does not do these things on headache days. (R. 48).

A "marked" restriction in daily activities is not defined "by a specific number of different activities of daily living or different behaviors in which functioning is impaired, but by the nature and overall degree of interference with function." 20 C.F.R. pt. 404, subpt. P, App'x 1, Listing of Impairments § 12.00C. A claimant may be markedly limited in daily activities, if he has "serious difficulty performing them without direct supervision, or in a suitable manner, **or on a consistent, useful, routine basis, or without undue interruptions or distractions**." *James v. Berryhill*, 2018 WL 3438912, at * 2 (N.D. Ill. July 17, 2018) (citing 20 C.F.R. pt. 404, subpt. P, App'x 1, Listing of Impairments § 12.00C) (emphasis added).

Here, the record shows that Plaintiff is not able to perform his activities of daily living on a "consistent, useful, or routine basis" on his "bad days" which occur 10-12 times a month. This cannot be reconciled with the ALJ's findings of only mild limitations. While the Court is not finding, conclusively, that Plaintiff has "marked" limitations in daily activities, the Court recommends that the ALJ attempt to reconcile this discrepancy on remand.

The ALJ also found mild limitations in the area of social functioning. The ALJ noted that Plaintiff was friendly, outgoing, and cooperative. (R. 20). The ALJ also noted that Plaintiff has one friend, tried to get involved in a fundraising group, and that he has family relationships with his adult kids. *Id.*

"Mild limitation" means that Plaintiff's is ability to function in the area of social functioning appropriately, effectively, and on a sustained basis is only slightly limited. 20 C.F.R. pt. 404, subpt. P, App'x 1, Listing of Impairments § 12.00F. Plaintiff testified that he was angry and hostile (R.303), and that sometimes he yells at children. (R.422).

6

Additionally, it is unclear how having one friend (who Plaintiff testifies that he has not seen in 6 months, (R. 40)) and "attempting" to get involved in a group shows that Plaintiff's abilities in this area are only "slightly" limited.

A marked limitation, however, requires his abilities in this area to be "severely" limited. 20 C.F.R. pt. 404, subpt. P, App'x 1, Listing of Impairments § 12.00F. Plaintiff did testify to having a girlfriend and maintaining relationships with his children. (R. 38-39). Thus, the evidence appears to suggest that Plaintiff has, at most, moderate limitations in this area. *See* 20 C.F.R. pt. 404, subpt. P, App'x 1, Listing of Impairments § 12.00F (listing "moderate" social functioning limitations as having "fair" functioning in this area). Again, the Court is not conclusively finding that Plaintiff has "moderate" limitations in social functioning, but the ALJ should reevaluate Plaintiff's limitations in social functioning on remand.

Finally, the ALJ noted only mild limitations in the area of concentration, persistence or pace. In order to support this, the ALJ noted that Plaintiff "tried" to start a woodworking business, and that he reportedly trained puppies. (R. 20). This is the full extent of the ALJ's analysis. However, Plaintiff plainly stated that his woodworking business never got off the ground and failed almost immediately. (R. 37). In fact, Plaintiff expressly testified that he was unable to "focus" on the business. *Id.* Moreover, Plaintiff had to stop his most recent job in March 2015 because he could not recall what he was supposed to do due to "poor concentration & attention with pain." (R. 636). The Court does not agree that a failed attempt at a woodworking business and some puppy training amounts only to mild limitations in concentration, persistence, or pace, especially when Plaintiff's most recent job attempt failed due to a concentration issue. On remand, the Court recommends that the ALJ address this discrepancy.

### 2. Headaches as they Related to the ALJ's Subjective Symptom Analysis

The ALJ appears to support her findings relating to the paragraph B criteria by determining that Plaintiff's subjective complaints were not consistent with other evidence in the record. *See* (R. 24) (stating that there is no way to verify Plaintiff's assertion of good days vs. bad days); *see also* (R. 23) (stating that the overall record fails

7

to support the claimant's allegations as to the disabling nature of his symptoms). However, the record reflects constant, consistent complaints of debilitating headaches.

On May 5, 2013, Plaintiff underwent a successful sent assisted coil embolization following the discovery of a vertebral artery aneurysm. (R. 298). On June 4, 2013, Plaintiff saw Dr. William Ashley. Dr. Ashley's notes indicate that Plaintiff was experiencing headaches prior to his aneurysm and that Plaintiff had been angry and hostile. (R. 303).

On September 23, 2013, Dr. Beth Fraum noted that Plaintiff suffers from headaches that were not relieved by Neurontin. (R. 434). On November 26, 2013, a social worker's note indicates that Plaintiff has to stay in bed all day on a bad headache day. (R. 421). The note also indicates that Plaintiff "sometimes snap(s) at children" and that he wishes he could control his yelling. (R. 422). Plaintiff is listed as having 5-10 bad days a month where he cannot get out of bed due to headaches. *Id.* On December 12, 2013, Plaintiff was still reporting headaches 3-4 times a week that were unresolved with medications. (R. 416). On December 31, 2013, the record indicates that Plaintiff reported 5-8 debilitating headaches a month and that he was unable to function 2-3 days per week. (R. 543).

On January 14, 2014, Plaintiff again saw Dr. Ashley. Dr. Ashley's notes state that Plaintiff had been experiencing headaches for at least 3 months as far back as May 2013. (R. 298). Dr. Ashley also noted chronic headaches of 8 to 10 episodes a month, and that Plaintiff's migraines continued following the stent placement for his aneurysm. *Id.*

On February 3, 2014, Plaintiff completed a functional report. In this report Plaintiff reported that on a bad day, he stays in a room and does nothing but rest. (R. 244). He also reported that the headaches last several days at a time. (R. 243). His girlfriend also completed a function report, that was consistent with Plaintiff's. Plaintiff's girlfriend reported that Plaintiff suffers debilitating headaches that sometimes require multiple days' rest. (R. 255).

On June 26, 2014, Plaintiff visited the emergency room for a headache. During this visit Plaintiff reported that his symptoms began 4 days prior to the visit and that he had a severe migraine that was accompanied by vomiting. (R. 478). On July 7, 2014, Plaintiff

8

stated that he was interested in working, but that his headaches prevented him from doing so. (R. 518)

On July 31, 2014, Plaintiff saw Dr. Yalamanchili. Dr. Yalamanchili's notes indicate that Plaintiff's headaches were "more frequent." (R. 470). Plaintiff's headaches were reported at 10-12 a month, with 5-8 days of severe headaches per month. *Id.* It was again noted that medication did not help much. *Id.*

On August 11, 2014, Plaintiff again reported headaches, stating that his last episode was "yesterday" and that it lasted for 3 days. (R. 507). On August 12, 2014, Plaintiff reported that he thinks his headaches were getting worse, and noted that he went to the emergency room for a headache in June. (R. 563).

Plaintiff returned to Dr. Ashley on October 28, 2014. At this visit Plaintiff reported that his headaches were "unchanged to slightly improved." (R. 562).

On November 11, 2014, Plaintiff had a neurology appointment. During this appointment, Plaintiff reported that his headaches were "much improved" after he started taking Topamax. (R. 691). However, Plaintiff was still reporting headaches at a level of 6/7-10 that lasted 10-12 hours a day. *Id.* In a functional report completed 8 days later on November 19, 2014, Plaintiff stated that his headaches keep him in bed for 2-3 days a week. (R. 271). Again, Plaintiff reported that on a "good day" he is a good cook (which is what the ALJ apparently used to determine that Plaintiff can cook for his family), but that on a bad day he does not even eat. (R. 273).

The records reflect that Plaintiff's relief he received from Topamax was short lived. On February 17, 2015, Plaintiff attended another neurology appointment. At this appointment, Plaintiff reported that he was unable to perform daily tasks "3-4 times per week." (R. 665). Plaintiff also reported headache pain at a level of "more than 10/10." *Id.* Plaintiff did report that the debilitating headaches have decreased to 1-2 per week and that the intensity has decreased to where he can perform simple daily tasks. *Id.* Importantly, however, Plaintiff noted that the Topamax helped him, but left him with significant side effects, including memory issues. *Id.* As a result, (and despite reporting

9

receiving relief from the Topamax), it was noted that Topamax should be discontinued "due to severe side effects." (R. 668).

Plaintiff saw his primary care physician on March 17, 2015, at which point he declared that he was not going to sit around waiting for his next migraine. (R. 648). Plaintiff continued to report that his headaches were severe. (R. 649).

Plaintiff attended another neurology appointment on May 26, 2015. At this appointment, Plaintiff reported that his last headache lasted 4 days. (R. 636). Plaintiff also mentioned a family history of headaches that was noted as "significant." *Id.*

A June 26, 2015, physical therapy note indicates that Plaintiff's chief complaint was headaches. (R. 627). A similar physical therapy note from August 11, 2015, showed chronic headaches. (R. 620).

Plaintiff had another neurology appointment on August 18, 2015. The notes from this appointment show Plaintiff complained of a chronic headache that was uncontrolled 10-12 times per month. (R. 614 - R. 616). On September 22, 2015, Plaintiff reported headache pain at 7/10. (R. 603). On December 3, 2015, the headache pain was reported at 8/10. (R. 581).

Thus, the record is replete with consistent reports of chronic, debilitating headache pain. The ALJ found that, despite the multiple, consistent reports of headache pain, Plaintiff's complaints were not as severe as alleged due to the lack of objective evidence to support his claims. (R. 23). As noted, An ALJ may not discount a claimant's testimony solely because it is not substantiated by objective medical evidence. 20 C.F.R. § 404.1529(c)(2). The ALJ notes "only routine and conservative treatment," (R. 23), but fails to indicate what other treatment Plaintiff should have engaged in for his debilitating migraines.

The ALJ further cites to the August 11, 2014, neurological evaluation that was "unremarkable," citing to Exhibit 6F, pages 22-23. (R. 24).[2] The ALJ may not "cherry pick" certain pieces of evidence that support a finding of not disabled, while ignoring

---

[2] The Court notes that the word "unremarkable" does not appear in the notes cited by the ALJ. *See* Exhibit 6F/22-23. The Court assumes, therefore, that the ALJ took this assessment from Dr. Jilhewar. *See* (R. 52).

10

other evidence that points to disability. *Denton v. Astrue*, 596 F.3d 419, 426 (7th Cir. 2010). The ALJ fails to build a logical bridge to show how one "unremarkable" neurological exam undermines the numerous notes showing Plaintiff with severe, debilitating headaches. More importantly, the ALJ notes that there was "only one example of poorly controlled headaches documented in the medical records." (R. 24). This is simply not true, as shown by the evidence outlined by the Court above.

The ALJ also relied heavily on Dr. Jilhewar, the medical expert that was present at Plaintiff's hearing. However, Dr. Jilhewar expressly stated that he could not tell the frequency of Plaintiff's headaches. (R. 52-53). It is unclear how the ALJ made the leap from this testimony to determining that Plaintiff's headache complaints were not as severe as alleged, considering Dr. Jilhewar was unable to tell their frequency.

Dr. Jilhewar also testified that "claimant was not hospitalized or given any other treatment for headaches." (R. 56). Plaintiff has a documented visit to the emergency room for headache related complaints. (R. 478). While Dr. Jilhewar (and the ALJ) are correct that Plaintiff was not "hospitalized" for headache treatment, neither Dr. Jilhewar nor the ALJ explain how hospitalization would have been required to treat a migraine. Put another way, Plaintiff testified that when he gets these severe and debilitating headaches, he can do nothing else but lie in a dark room, trying to keep it as quiet as possible, while he waits for the pain to stop. (R. 40). It is unclear how admission to the hospital would change this. Furthermore, Dr. Jilhewar's statement that Plaintiff was "not given any other treatment for headaches" is incorrect. The record is replete with mentions of all the medications Plaintiff was prescribed for headache relief. *See*, e.g. (R. 691) (Topamax); (R. 434) (Neurontin); (R. 52) (Imitrex); (R. 59) (Lyrica). Dr. Jilhewar admitted that Plaintiff has been on headache medication since 2009. (R. 58). Dr. Jilhewar fails to identify what "other" treatment Plaintiff would have engaged in aside from his heavy medication regimen, nor does any other physician in the record suggest a course of treatment that Plaintiff was unwilling to undertake.

Finally, and most importantly, Dr. Jilhewar specifically stated that he did not believe that Plaintiff's headaches were severe because they had improved, citing to

11

Exhibit 8F. (R. 57). However, the same record that Dr. Jilhewar cites to is the record where Plaintiff explains that that his headaches have improved with Topamax, but that the Topamax has caused him significant side effects. (R. 668). The Topamax, which was the source of the headache relief, was discontinued at this visit. *Id.*

Although it does not constitute error for the ALJ to consider lack of objective evidence, this factor must be supplemented by other factors, such as the claimant's activity levels and the treatment he received to alleviate the pain or other symptoms. 20 C.F.R. § 404.1529(c)(2)-(4); *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009). As already discussed, the ALJ's assessment of Plaintiff's activity levels focuses only on what Plaintiff is able to do on his good days and not what Plaintiff is (or is not) able to do on his bad days.

Additionally, the ALJ expressly noted that "prescribed treatment and medications have resolved/improved condition," and that Plaintiff reported relief with Topamax. (R. 26). However, there are multiple instances in the record where Plaintiff reports that medications do not relieve his pain. (R. 416; R. 420). Dr. Jilhewar even noted that Plaintiff reported that his headache had not responded to "gabapentin, Vicodin, [or] Flexeril." (R. 52).

Moreover, as noted multiple times, while Plaintiff did report relief from Topamax, it was discontinued due to severe side effects. (R. 668). The ALJ also noted that Plaintiff testified that medications make his pain tolerable. (R. 24). What Plaintiff actually stated was that medications make it tolerable if he is "left alone for the most part." (R. 44). It would be virtually impossible for Plaintiff to be "left alone for the most part" so that his pain could be tolerable while he was engaged in full time employment. More importantly, Plaintiff clarified that "tolerable" to him meant that he could lie down and try to get comfortable, whereas without medication, it hurts to even lie down. (R. 44). The VE expressly stated that someone who experienced symptoms described by Plaintiff as "tolerable" would not be able to work. (R. 63).

The ALJ also noted that she gave "great weight" to the state agency consultants. (R. 20). The state agency consultants found that Plaintiff was only "partially credible."

However, both consultants based their partially adverse credibility findings on that fact that Plaintiff's alleged "walking" limitations exceed that supported by the evidence. (R. 70; R. 93). Neither state agency consultant made any adverse credibility findings related to Plaintiff's testimony about his headaches. Additionally, both consultants stated that Plaintiff's activities of daily living were the most informative piece of information regarding their credibility findings. *Id.* Considering that Plaintiff can only perform his ADLs on "good days," and that Plaintiff was not found to lack credibility based on his headache complaints, it is logical to assume that the state agency consultants found Plaintiff's testimony about his ADLs on bad days to be credible.

Finally, the Court notes (as did Plaintiff) that Plaintiff was very forthcoming about his testimony on what he can do on good days. Plaintiff admitted that he can basically do anything and everything on a "good day." (R. 40). Plaintiff testified that he wants to work (R. 518) and that he was not just going to sit around and wait for headaches (R. 648). Furthermore, Plaintiff attempted to find employment in March 2015, but had had stop working because his pain caused poor concentration and attention. (R. 636). The ALJ, however, appeared to hold this against Plaintiff and not take into account what he cannot do on his bad days.

As Plaintiff notes, no medical professional has doubted his reports of headaches and, despite "unremarkable" neurological examinations, the physicians have continued to attempt to treat Plaintiff's headache symptoms. The ALJ failed to support her subjective symptom analysis with substantial evidence and the Court therefore recommends this case be remanded.

    b.    **Treating Physicians**

Plaintiff also argues that the ALJ impermissibly discounted the opinions of his treating physicians. The ALJ must give controlling weight to a treating source's opinion if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." *Punzio v. Astrue*, 630 F. 3d 704, 710 (7th Cir. 2011) (citing § 404.1527(c)). The Regulations give several factors the ALJ considers in evaluating a treating physician's opinion: the length, nature, and

13

extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion. 20 C.F.R. §§ 404.1527(c). "If the ALJ discounts the physician's opinion after considering these factors, [the Court] must allow that decision to stand so long as the ALJ minimally articulated his reasons--a very deferential standard that [the Seventh Circuit has], in fact, deemed lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (citations omitted).

The ALJ first notes that "[t]here is no medical opinion stating that the claimant is unable to work other than that in the one-time consultative examination." However, it is not clear why the ALJ found this factor to be important. ALJs (and the Commissioner) routinely reject these findings by pointing out that this "ultimate determination of disability" is reserved solely to the Commissioner. *See* 20 C.F.R. 404.1527(d). Thus, even if a physician had made this assessment, it is highly likely that the ALJ would have rejected it (and the Commissioner would have argued that this rejection was proper).

The ALJ assigned some weight to the state agency medical consultant's position that Plaintiff could perform "light work." The ALJ further restricted Plaintiff to only sedentary work, stating that the overall evidence better supported this RFC. While Plaintiff does not make any additional arguments regarding the state agency consultants other than those related to the paragraph B criteria, the ALJ, on remand, should reevaluate her assessment of the state agency consultants' opinions in light of the Court's findings on the paragraph B criteria listed in Section II(a)(1), *supra*.

The ALJ also gave "great weight" to Dr. Jilhewar. For the reasons discussed in Section II(a)(2), *supra*, on remand the ALJ should reevaluate the appropriate weight of Dr. Jilhewar's testimony.

Finally, the ALJ assigned "no weight" to examining psychologist James Goebel, Ph.D. Dr. Goebel determined that Plaintiff's sustained concentration and persistence is markedly limited. (R. 469). The Court has already determined that the ALJ failed to adequately articulate her findings relating to concentration, persistence, and pace. The

ALJ should reevaluate the appropriate weight of Dr. Goebel's findings on remand, in light of the Court's order.

Furthermore, Dr. Goebel stated that Plaintiff would miss 5-6 days of work per month due to his headaches. (R. 469). The ALJ likely gave "no weight" to this finding due to her determination that the record fails to support Plaintiff's subjective complaints. The Court, however, has determined that the ALJ failed to adequately support this determination with substantial evidence. On remand, the ALJ should reevaluate the weight given to Dr. Goebel's statement that Plaintiff will miss 5-6 days of work a month in light of the Court's findings regarding Plaintiff's subjective complaints of debilitating headache symptoms. This is particularly true given the testimony of the VE that Plaintiff could not miss more than one day of work, per month, on average. (R. 62).[3]

   c.   **Vocational Expert's Testimony**

Plaintiff's final argument is that the vocational expert's testimony regarding other available work is not reliable. The ALJ noted that, pursuant to SSR 00-4p, the VE's testimony is consistent with the information contained in the Dictionary of Occupational Titles ("DOT"). Plaintiff argues that the ALJ unreasonably relied on the VE's estimate of the number of jobs that exist because the DOT does not say how many available jobs exist.

Plaintiff's argument appears to be that a VE should never rely on the DOT because the DOT does not contain information on which to base an estimate of the number of available jobs of a particular kind. But the Seventh Circuit has expressly stated that the VE is "required to estimate the number of jobs the claimant can do that exist in the local, regional, and national economy." *Browning v. Colvin*, 766 F.3d 702, 708 (7th Cir. 2014).

Plaintiff, however, is correct that the Seventh Circuit has also questioned the source or accuracy of the number of jobs that VE's claim plaintiffs can perform that exist in the plaintiff's area, because there is no official source of number of jobs for each job

---

[3] The Court also points out that Dr. Goebel found that Plaintiff is not limited in his ability to do work related activities despite his limitations regarding understanding and memory. (R. 469). Dr. Goebel also found that Plaintiff is not limited in social interaction and adaptation. *Id.* The ALJ, of course, may take these factors into account on remand as well.

classification. *See Browning*, 766 F.3d at 709; *see also Alaura v. Colvin*, 797 F.3d 503, 507 (7th Cir. 2015). However, these statements, as many district courts have noted, are merely dicta. *See, e.g.*, *Sitter v. Berryhill*, 2017 U.S. Dist. LEXIS 75840, at *37 n.24 (E.D. Wis. May 17, 2017) ("the statement in *Alaura* appears to be dicta."); *Adamec v. Berryhill*, 2017 U.S. Dist. LEXIS 48799, at *20 (N.D. Ill. Mar. 31, 2017) ("[T]he Seventh Circuit's repeated criticism of the use of the DOT in VE testimony, while pointed, was merely dicta and does not merit remand."); *see also Boyles v. Acting Comm'r of the SSA*, 2018 U.S. Dist. LEXIS 39835, at *14-15 (N.D. Ind. Mar. 12, 2018) (collecting cases holding that *Alaura*'s criticism of VE methodology was dicta); *Chavez v. Berryhill*, 2017 U.S. Dist. LEXIS 114579, at *12 (N.D. Ind. July 24, 2017) ("Courts have refused to remand solely for challenges to VE methodology, citing a lack of guidance from the Seventh Circuit[.]"); *Hoffman v. Colvin*, 2016 U.S. Dist. LEXIS 128086, at *19 (E.D. Wis. Sept. 20, 2016) (characterizing *Alaura*'s discussion of VE testimony as "classic dicta"). Plaintiff cites no case in which the Seventh Circuit reversed on this basis alone. Thus, Plaintiff's statement in his Reply (#16) that it is "[w]ell established in the Seventh Circuit that DOT classifications are obsolete and of questionable reliability," while citing to *Browning*, is incorrect.

Furthermore, as the Commissioner notes, an ALJ must resolve only an apparent conflict between the VE's testimony and the DOT unless Plaintiff identifies the conflict at the hearing. SSR 00-4p. Plaintiff offers no evidence that the VE's data was challenged at the administrative hearing. Plaintiff's questions to the VE at the hearing had nothing to do with the DOT and the number of jobs available in the economy. *See* (R. 63). As it stands, the vocational expert's testimony "was both unobjected to and uncontradicted; thus, the ALJ was entitled to credit it." *See Brown v. Colvin*, 845 F.3d 247, 254 (7th Cir. 2016) (finding that claimant forfeited arguments regarding the vocational expert's data by failing to object to her testimony during the administrative hearing); *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009) (same); *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004) ("[B]ecause [the claimant's] lawyer did not question the basis for the vocational expert's testimony, purely conclusional though that testimony was, any objection to it is forfeited."); *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) ("When

no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion.").

Consequently, Plaintiff's reliance on *Browning* to challenge the VE's job estimate is misplaced. *See Stojanovic v. Berryhill*, 2018 U.S. Dist. LEXIS 46009, at *12 (E.D. Wisc., March 20, 2018).

## IV. Conclusion

For these reasons, the Court recommends that Plaintiff's Motion for Summary Judgment **(#11)** be **GRANTED**, Defendant's Motion for Summary Judgment **(#15)** be **DENIED**, and that this case be remanded under Sentence Four of § 405(g). The parties are advised that any objection to this recommendation must be filed in writing with the clerk within 14 days after being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).

ENTERED this 20th day of February, 2019.

s/ERIC I. LONG
UNITED STATES MAGISTRATE JUDGE